# ROLFE v. KAISLING.


PATENTS; INTERFERENCE; REDUCTION TO PRACTICE; DILIGENCE; ADMISSIONS.

1. In an interference involving priority of invention of a self-soldering thermal cut-out automatically operated by the heat produced by an abnormal current in the circuit containing the cut-out, the disclosure by one of the parties of the invention by description and test, followed by the construction by him of a device embodying it, which was successfully tested by the use of hot water instead of an electric current, was held to constitute reduction to practice, in view of the prior state of the art. (Following *Rolfe* v. *Hoffman,* 26 App. D. C. 336.) ·

2. Failure by one of the parties to an interference to file an application for four years after conception of the invention, during which time he constructed a device embodying it, discussed it freely with others, and endeavored to interest men of means to exploit it, does not show such lack of diligence as will preclude him from asserting his rights against the other party, although the latter was diligent both in respect to reduction to practice and in applying for a patent. (Following *Rolfe* v. *Hoffman, supra,* and distinguishing *Mason* v. *Hepburn,* 13 App. D. C. 86, and *Warner* v. *Smith,* 13 App. D. C. 111.)

3. Where one of the parties to an interference testified that, before the date of conception alleged by the other party, he disclosed to him the invention, and the other party does not deny it, his silence is sufficient to justify the conclusion that the disclosure was made. (Following *Winslow* v. *Austin,* 14 App. D. C. 137.)

No. 536.  Patent Appeals.  Submitted January 13, 1909. Decided March 2, 1909.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case. *Affirmed.*

The facts are stated in the opinion.

*Mr. A. Miller Belfield* and *Messrs. Bacon & Milans* for the appellant.

*Mr. Arthur B. Seibold, Mr. W. Clyde Jones, Mr. Robert Lewis Ames,* and *Mr. George R. Hamlin* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

This is an appeal by Charles A. Rolfe from the decision of the Commissioner of Patents awarding priority of invention to Edward W. Leeper, the junior party to an interference proceeding. The claims of the issue are stated in the following counts:

"1. An electrical controller comprising thermally operable securing means releasable on a change in electrical circuit conditions, and having provisions whereby it is automatically resecured in operable condition preparatory for another operation.

"2. An electrical circuit protector comprising solder controlled devices for protecting the circuit on the passage of an unduly strong current, and having provisions for automatically resoldering itself preparatory for another operation.

"3. An electrical circuit protector comprising a movable part, a solder joint for normally securing said part in position, a thermal device for releasing said solder joint, and means for moving said movable part, said protector having provisions for automatically resoldering said joint with the protector in operative condition.

"4. An electrical circuit protector comprising means operable upon an excess of current for protecting the circuit, and having provisions whereby it is automatically reset and resoldered in reset condition.

"5 In an electrical circuit protector, the combination of a quantity of cementing material, means for softening said material on the passage of an unduly strong current, a movable part normally held against movement by said cementing material, and means for moving said part when the same is released by the passage of an unduly strong current, said part being moved into position for another operation and associated with said cementing material after movement, whereby said part is automatically recemented after movement.

"6. In an electrical circuit protector, the combination of a movable part normally held against movement by a solder joint, means for softening the solder of said joint on the passage of an unduly strong current, and means for moving said part when the same is released by the softening of the solder, said part being moved into position for another operation and being associated with the solder after such movement, whereby the parts are resoldered or self-soldered preparatory for another operation."

The invention, as the counts indicate, relates to a self-soldering thermal cut-out automatically operated by the heat produced by an abnormal current in the circuit containing the cut-out; the object of the invention being the protection of the instruments in the circuit. It is not disputed that thermal cut-outs were well known in the art prior to the date of this invention. One great disadvantage of the cut-outs of the prior art was that, when an abnormal current had softened the solder, disrupted the parts, and thereby opened the circuit, the cut-out was thereafter useless, and had to be replaced. To quote from the decision of the Board of Examiners in Chief: "The idea of the invention in the issue is to go one step further in this bonded, as it were, cut-out in arranging it so as to be self-restoring. This idea is carried out in the embodiment of both the interferants substantially along the same line. A wire is used on which solder is mounted, and enclosing the solder is a cylinder or tube to which is secured a wheel or detent in the teeth of which a catch engages, the other end of the catch being secured to an automatically opening switch. The solder serves to hold the cylinder against actual rotation on the wire,

thereby allowing the catch to remain engaged in the detent, and holding the switch closed. Upon the passage of a current of suitable strength the solder is softened at the point of its adhesion to the wire, thereby allowing the tube to turn upon the wire, and releasing the catch, which permits the spring to operate to open the switch, thereby opening the circuit. In the course of time after the passage of the current the solder again gets hard and rebonds itself, as it were, to the wire, thus locking the cylinder fast thereon, and thereby restoring itself in the condition it originally was. The invention, it can well be imagined, is a very desirable one."

William Kaisling, having taken no testimony, is restricted to his filing date of October 5, 1903, which, being subsequent to the filing date of Rolfe, eliminates Kaisling from the case.

The Examiner of Interferences awarded priority to Leeper, but his decision was reversed by the Examiners-in-Chief. The Assistant Commissioner, in turn, reversed the Board and awarded priority to Leeper. There is, however, very little conflict in the findings of fact of the three tribunals. Each has found that Leeper conceived the invention and fully disclosed it to others prior to the earliest date claimed or established by Rolfe. Each has found that Leeper constructed a device disclosing the invention prior to Rolfe's entry in the field. The Examiner of Interferences and the Assistant Commissioner each has held that this device constituted a reduction to practice, while the Board of Examiners-in-Chief has held that it did not.

In 1900 Leeper was in the employ of the Central Union Telephone Company, in Ohio, and had had experience with cut-outs of the prior art. While conducting experiments he conceived the invention of the issue, and on April 15, 1900, addressed a letter to one E. L. Cook, in which he disclosed the invention. The sending and receipt of this letter, together with its contents, were fully established by competent evidence. On the 24th of April of the same year, Leeper wrote to his mother, Mrs. Mary R. Tapy, and disclosed the invention by description and sketch, which letter was introduced in evidence, its receipt by Mrs. Tapy having been proven. In June, 1900, Leeper

left the Central Union Telephone Company, and entered the service of the Underwriters Association, in Chicago, Illinois. It is clearly established that in July or August of the same year, he constructed a full-sized device which, as above stated, each of the tribunals of the Patent Office has held fully disclosed the issue. In the fall of 1900 he exhibited his device to his mother, his step-father, H. H. Tapy, a bookkeeper named Charles H. Hunt, and a dining-car conductor named Edmund J. Johnson, who was interested in batteries and telegraph instruments. On January 1, 1901, Leeper exhibited his device to LeRoy Drake, an electrical engineer and a graduate of the Armour Institute of Technology. Mr. Drake, although blind, testified with convincing clearness. He selected Leeper's Exhibit No. 1, which contained the novel parts of the original device, from among other exhibits, and was able to identify the apparatus. Asked to describe the device examined by him on January 1, 1901, he replied: "The device to which I allude was, and is known to me, as an automatic circuit breaker. It consisted of an ordinary knife switch of the single-pole type, mounted on an insulating base, a wire extended from the place into which the blade of the switch would fit, through a kind of cartridge and thence to the place where it would be connected to the circuit on which it was to be placed. At the end of the insulated handle of the switch extended a piece of metal having at its lower end a kind of fork which was engaged by one of a series of depressions at the large end of the cartridge. The cartridge contained a compound susceptible to heat, and when said cartridge was heated to the proper temperature, it would move freely on the wire previously described." The witness was positive that the wire and cartridge in the device which he examined on the stand were the same as those in the original device. The witness testified that he successfully tested the original device by the use of hot water. Other witnesses either tested it or saw it tested by the use of matches.

In *Rolfe* v. *Hoffman,* 26 App. D. C. 336, the questions whether a similar device constructed by Rolfe (a party to this interference) constituted a reduction to practice was before the

court, and the court held that the invention demonstrated itself, saying: "The invention relates to devices for protecting low-tension circuits, such as telegraph, telephone, and fire-alarm, from injurious effects of unduly strong currents, such as those carried by power and lighting circuits. The art is a well-developed one, and most of the devices used for the purpose are simple and their working well understood, not only by electricians, but by those who work in that line, yet lay no claim to be ranked as experts. A man of ordinary skill and experience in the art would, in our opinion, understand the device in controversy, and would come to the conclusion that it would work. * * * The device in controversy belongs to the type of simple devices disclosed and referred to in *Mason* v. *Hepburn,* 13 App. D. C. 86; *Roe* v. *Hanson,* 19 App. D. C. 559, and analogous cases, rather than to the devices disclosed in *Macdonald* v. *Edison,* 21 App. D. C. 527, and analogous cases."

The only thing about this device that is new is the rotable resoldering detent. It was well known that a current of a given strength over a wire of a given size would soften the detent, and thereby open the circuit. It was equally well known that the opening of the circuit cut off the heat supply, and thereby permitted the solder to harden, which in this case meant that the rotable element would again become rigid. As was stated by the Board of Examiners-in-Chief: "It cannot be doubted from the evidence that an electric current of sufficient strength will soften solder, and that the solder will harden upon cooling, and that a suitable spring will open the switch, and those things can rightfully be inferred of the device alleged to have been disclosed (The Leeper device) from the past experience of those skilled in the art of non-self-restoring thermal cut-outs." Or, as was stated by the Assistant Commissioner: "Fuses and circuit protectors were in common use. These devices generally used solder, which fused when subjected to the heat produced by an abnormal current, and thereby opened the circuit, or permitted devices to operate and break the circuit. The resistance of the wire and the melting point of the solder determined the amount of current that the circuit would carry

without operating the device and the time within which it would operate with a given current. It was well known that by varying the size of the wire and the melting point of the solder used in constructing the device, it was possible to vary the current and the time necessary to operate it. It was not necessary for Leeper to test his device to ascertain these facts. He knew that if the device operated when subjected to the heat of water or a flame, it would operate when the heat was generated in an electric circuit."

Having in mind the prior state of the art, and the tests made of Leeper's original device, we hold that it constituted a reduction to practice.

There is no controversy regarding the date to which Leeper is entitled, which is earlier than the earliest date even claimed by Rolfe. It is, however, contended that Leeper by his long delay in filing his application is estopped to set up his rights against those of Rolfe, who was diligent both in respect to reduction to practice and in applying for a patent. It is true that Leeper's application was not filed until May 28, 1904. It is also true that he did not conceal or abandon his invention. The evidence shows quite the contrary. He appears to have realized its value, to have discussed it freely with others, and to have endeavored to interest men of means to exploit it. We do not think the evidence brings the case within the doctrine enunciated in *Mason* v. *Hepburn, supra,* and *Warner* v. *Smith,* 13 App. D. C. 111, but rather under the rule announced in *Rolfe* v. *Hoffman, supra.*

Another point remains to be noticed. On January 3, 1901, in the course of his employment Leeper inspected a building in Chicago in which Rolfe had a shop. The date of this inspection is established by oral testimony and by the records of the Underwriters Association. Leeper testified that he then had a conversation with Rolfe relating to heat coils; and explained to Rolfe the self-soldering feature of his invention and the experiments he had made "with the old Bell heat coil." These experiments Leeper at another point in his testimony described as follows:

"I got to experimenting with the coil, and noted that there was a central pin connecting the two sections, and that when the coil was heated one section could be rotated relatively to the other without pulling the coil apart, and that after the coil was cooled it was left in its original condition. I conceived the idea that with a set of springs somewhat similar to the old springs, but arranged so as to catch in the notches in one of the sections of the coil, the combination could be used so as to make a heat coil arrangement that would not need to be sent back to the factory for repairs after it had operated once."

No attempt was made by Rolfe to meet this testimony. It appears that at the time of the interview he was highly skilled in the art, and that prior thereto he was not in possession of the invention. This testimony is consistent, and, if true, defeats Rolfe's claim, for enough was disclosed to enable one skilled in the art to practice the invention. Rolfe was in a position to know whether it was true, and his silence in the circumstances justifies the conclusion that it was. *Winslow* v. *Austin,* 14 App. D. C. 137.

We find no error in the decision from which this appeal was prosecuted, and therefore affirm it.

The clerk of this court will certify this opinion and the proceedings in this court to the Commissioner of Patents, as required by law.                                        *Affirmed.*